UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

GREGORY ALLEN I.,                    )
                                      )
            Plaintiff,                )
                                      )
    vs.                               )        Case No. 1:18 CV 246 (JMB)
                                      )
ANDREW M. SAUL,[1]                    )
Commissioner of the Social Security   )
Administration,                       )
                                      )
            Defendant.                )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security

Administration. The parties have consented to the jurisdiction of the undersigned United States

Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## I. Procedural History

On May 8, 2014, plaintiff Gregory Allen I. filed applications for a period of disability and

disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq*., and supplemental security

income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of June 30, 2006.[2] (Tr.

297-300, 303-09, 363). Plaintiff subsequently amended the alleged onset date to March 26,

2014. (Tr. 78). After plaintiff's applications were denied on initial consideration (Tr. 169-73),

he requested a hearing from an Administrative Law Judge (ALJ). (Tr. 178). Following a

_____

[1] After this case was filed, a new Commissioner of Social Security was confirmed. Pursuant to Rule
25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Deputy Commissioner
Nancy A. Berryhill as the defendant in this suit.

[2] Plaintiff sought benefits on three prior occasion. Two were denied at the initial determination stage and
one was denied following a hearing. (Tr. 114).

hearing on March 17, 2016 (Tr. 82-112), the ALJ issued an unfavorable decision. (Tr. 143-63). Plaintiff appealed this decision and, on May 25, 2017, the Appeals Council remanded the case to the ALJ with instructions.[3] (Tr. 164-68).

Plaintiff and counsel appeared before the same ALJ for a second hearing on March 20, 2018. (Tr. 36-81). Plaintiff testified concerning his disability, daily activities, functional limitations, and past work. The ALJ also received testimony from vocational expert Susan Shea, M.A. The ALJ issued a decision denying plaintiff's applications on May 4, 2018. (Tr. 12-35). The Appeals Council denied plaintiff's request for review on August 10, 2018. (Tr. 1-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability and Function Reports and Hearing Testimony

Plaintiff, who was born in February 1962, was 52 years old on the amended alleged onset date. He graduated from high school after completing a vocational program in electronics. (Tr. 383). Following a brief period in the military, plaintiff returned to his parents' home.[4] (Tr. 102). After his mother died in December 2012, plaintiff assumed primary care for his father until early 2014, when his father died. (Tr. 88-89). In April 2014, plaintiff moved into a one-bedroom house paid for by the Department of Mental Health through the Supported Community Living Program. (Tr. 46, 87). He received mental health and case management services through the Community Counseling Center and New Visions. (Tr. 93). He last worked in late 2014 at a Dollar Tree store and earned a total of $147 in the final quarter of the year. (Tr. 88, 18).

---

[3] The Appeals Council instructed the ALJ to provide further explanation of the weight given to opinion evidence; give further consideration to plaintiff's residual functional capacity and, if warranted, obtain supplemental evidence from a vocational expert. (Tr. 166-67).

[4] Plaintiff was discharged from the Marines due to his drug use. (Tr. 505).

At his hearing in March 2016, he testified that he was unable to keep jobs for very long due to his mental health issues and that he had had "100 jobs in [his] lifetime."[5]  (Tr. 89).  He had confrontations with "smart ass young punks" and "bosses that aren't capable of earning my respect."  He was fired once after "confronting a known shoplifter too aggressively, allegedly." (Tr. 99, 55-56).  Several bosses had given him second and third chances but he "blew it" and had lost "an awful lot of good jobs."  (Tr. 97).  He had worked as a welder fabricator, a machinist apprentice, a trailer mechanic, and a stocker and cashier for a grocery store.  (Tr. 103-07, 46-47). Earnings records from 1980 through 2015 show that he earned less than $7,500 during most years.  (Tr. 310).

When plaintiff applied for disability benefits in 2014, he listed his impairments as depression; anxiety; borderline personality disorder; paranoid psychotic; arthritis in the knees, ankle, and feet; and insomnia.  He also became easily fatigued in the heat.  (Tr. 113).  In May 2013, his medications included Ambien, Benadryl, Klonopin, and Restoril for sleep; Mirapex for restless leg syndrome; Paxil for depression; and Vistaril for anxiety.  He also took meloxicam for arthritis and a cholesterol medication.  (Tr. 385).  In August 2015, plaintiff reported that he was also prescribed trazodone for depression and insomnia.  (Tr. 434).

In his May 2014 Function Report (Tr. 402-12), plaintiff stated that he was unable to work due to arthritis which limited the number of hours he could be on his feet and his inability to tolerate heat.  But, he wrote, his mental health issues made it impossible for him to maintain employment.  He had insomnia and ate one meal a day.  He was indifferent to his appearance and showered about once a week.  He was able to handle his household chores and took care of his dog.  He did not drive because he did not have a license and relied on a bicycle for

---

[5] Plaintiff's earnings record lists over 50 employers between 1980 and 2014.  (Tr. 311-24).

transportation.[6]  He shopped in stores as needed.  He had no difficulty managing financial accounts.  He stated that he socialized often but offered no description of his social activities and stated that he did not go anywhere on a regular basis.  He had difficulty getting along with others, especially authority figures, and had been fired due to his anger issues.  He needed antianxiety medication to cope with stress and managed changes in routine only when the change "improves efficiency."  He had a strong sense of impending doom and was plagued by almost constant "hateful violent thoughts."  (Tr. 408).  Plaintiff had difficulties with squatting, standing, walking, kneeling, climbing stairs, completing tasks, concentrating, understanding, and getting along with others.  He followed written, but not spoken, instructions well.

Plaintiff described his typical day as walking his dog, running errands, and then working on projects at home, including fixing up an old truck and doing yard work.  (Tr. 95).   He had a basement shop in which he made models.  (Tr. 48).  He had strongly negative feelings about his neighborhood.  (Tr. 56-57).

At the March 2016 hearing, plaintiff testified that he was kept from working by arthritis in his lower legs.  (Tr. 89).  His feet, which had caused him the most pain, improved after surgery to remove bone spurs.  At the time of the hearing, his primary physical problem was knee pain, for which he took meloxicam.  Cortisone shots had not provided much relief.  He used his bicycle for transportation and typically rode 20 or 30 miles a week.[7]  (Tr. 89-92).  He walked his dog about 45 minutes a day.  At the subsequent hearing in March 2018, plaintiff stated that his arthritis limited how long he could stand but did not interfere with his ability to do grocery

---

[6] In November 2017, plaintiff told psychologist Georgette Johnson, Psy.D., that his reliance on a bicycle for transportation interfered with his ability to keep medical appointments, causing him to be labeled as noncompliant with treatment.  (Tr. 642).

[7] Plaintiff testified that he previously rode with a bike club and rode about 11,000 miles in 1999 and 2000. (Tr. 92).

shopping or manage his household chores.  (Tr. 46).  He still walked his dog and relied on his bicycle for transportation.  At his present level of activity his knee pain was managed with Tylenol and aspirin but he would need to resume taking meloxicam if he had to spend more time on his feet.  (Tr. 47).

Plaintiff stated that his mental health conditions and insomnia are his primary impairments.  (Tr. 95, 97, 59).  Following his father's death in 2014, he became scared by his thoughts and requested "an in-depth psychological evaluation."  (Tr. 93, 71-72).  He described difficulty managing his anger in dealing with a neighbor he described as "crazy" and a "true sociopath."  (Tr. 97, 93).   At his hearing in March 2018, he described feeling "homicidal hate and rage," which he attributed to the conditions in his neighborhood.   (Tr. 56-57).  Plaintiff testified that for three years he had been sleeping less than two hours a night.  (Tr. 59).  Plaintiff had been sober since sometime in late 2014.  (Tr. 96, 68).

The ALJ received testimony from vocational experts at both hearings. In March 2016, Dolores Gonzalez, M.Ed., was asked to testify about the employment opportunities for a hypothetical person who was closely approaching advanced age, with a high school education, with plaintiff's work history who was limited to medium work, who could occasionally climb ladders, ropes, and scaffolds and was limited to simple, routine, repetitive tasks, involving only simple decisions and few workplace changes in an environment without fast-paced quotas.  Ms. Gonzalez was also asked to assume that the individual was limited to occasional interaction with co-workers and no interaction with the general public.  (Tr. 108).  According to Ms. Gonzalez, such an individual would not be able to perform plaintiff's past work as a welder, machinist, trailer mechanic, stocker, and cashier.  (Tr. 104-07, 108).  Other work available in the national economy the individual could perform included cleaner II, dump-truck driver, and salvage

laborer. The individual would not be able to work as a dump-truck driver if he were further restricted to only occasional kneeling and use of foot controls, but he could work as a cleaner II, salvage laborer, and stubber. All work would be precluded if the individual consistently missed three or more work days each month or had a thirty percent reduction in the ability to maintain socially appropriate behavior with coworkers and supervisors. (Tr. 108-10).

At the second hearing in March 2018, Susan Shea, M.A., testified that the hypothetical individual, now assumed to be of advanced age but still able to perform medium work, could not perform plaintiff's past relevant work as a machinist apprentice but could work as a laundry worker, machine feeder, and hand packager. (Tr. 61, 64-65). If limited to light work and assumed to be approaching advanced age, the same individual could work as a cleaner or housekeeper, small product assembler, and light machine tender. (Tr. 65-66). No work would be available if the individual were off task 20% of the day, missed two or more days of work per month due to mental health issues, was limited to interacting with others for no more than 10% of the day, or was verbally or physically inappropriate in the workplace. (Tr. 66-67).

### B. Medical Evidence

Plaintiff challenges the ALJ's evaluation of medical opinions regarding limitations caused by his mental impairments. Accordingly, the following review of the medical evidence focuses primarily on the treatment plaintiff received for those impairments.

Plaintiff's primary care physician, Mark Kasten, M.D., listed depression, anxiety, and anger issues among the conditions for which he was treating plaintiff in 2011. Plaintiff's medications included Zoloft for depression, buspirone for anxiety, Invega,[8] Ambien for

---

[8] Invega, or paliperidone, is an atypical antipsychotic used to treat the symptoms of schizophrenia (a mental illness that causes disturbed or unusual thinking, loss of interest in life, and strong or inappropriate emotions). See https://medlineplus.gov/druginfo/meds/a607005.html (last visited Aug. 15, 2019).

insomnia, and Mirapex for restless leg syndrome. (Tr. 480-82; 478-79). In November 2011, plaintiff told psychiatrist Kishore Khot, M.D., of the Community Counseling Center (CCC), that he stopped taking Zoloft and Invega because he did not believe they were helping. (Tr. 498). Dr. Khot noted that plaintiff's mood and affect were both anxious. He did not have suicidal or homicidal ideation or overt psychosis and he was alert and oriented. His diagnosis was generalized anxiety disorder with restless legs syndrome as a relevant medical condition. Dr. Khot reviewed anxiety-management skills with plaintiff and officially discontinued Invega and Zoloft. A month later, however, plaintiff called CCC and asked for a prescription for Zoloft, stating that he had been calling in sick to work and had suicidal thoughts. (Tr. 495). He had resumed taking some Zoloft he had on hand. He was given appointments to see nurse Daniela Kantcheva, APRN, but he did not keep appointments on December 29, 2011, or January 17, 2012. (Tr. 495). By the time he saw Dr. Khot in March 2012, plaintiff had changed his mind yet again and did not want to take Zoloft or other antidepressants because they caused him to sweat. (Tr. 492). He reported that he had lost his job at a supermarket because he yelled at a customer who had previously shoplifted.

In April 2012, plaintiff went to the emergency room at Southeast Missouri Hospital with flank pain that was diagnosed as kidney stones.[9] (Tr. 623-31). At follow-up with Dr. Kasten on May 1, 2012, plaintiff reported that he was anxious and had suicidal thoughts and sleep disturbance. (Tr. 473-75). On June 25, 2012, Dr. Khot noted that plaintiff was feeling more anxious. (Tr. 496). Plaintiff reported that he was looking for work. On mental status examination, plaintiff's mood and affect were both anxious, he was alert and oriented, with normal speech, and he did not have suicidal or homicidal ideation or overt psychosis. Dr. Khot

---

[9] In August 2015, plaintiff was again treated for kidney stones. (Tr. 611-20).

continued plaintiff's prescriptions for buspirone and Ambien and added Vistaril as needed for anxiety. Dr. Khot also warned him not to double up on his Mirapex prescription to treat his restless legs syndrome.

In August 2012, plaintiff told Dr. Kasten that he had stopped drinking and complained of increasing stomach pain. (Tr. 470-72). A CT scan of the abdomen disclosed tiny nonobstructive renal calculi and colon diverticulosis. (Tr. 605). Two benign polyps were removed during a colonoscopy in December 2012. (Tr. 604). In the autumn of 2012, plaintiff had injections to his knees and feet to treat joint pain. (Tr. 538-39; 468-69; 466-67).

Plaintiff failed to keep an appointment with Dr. Khot in September 2012. In October, plaintiff continued to present with anxious mood and affect and was still looking for work. (Tr. 488). Plaintiff did not return to CCC until early 2014.

Plaintiff had bone spurs removed from his feet in January and February 2013. (Tr. 462-65, 530-31, 535-37, 533-34, 528-39). In September 2013, Dr. Kasten noted that plaintiff was awakening 5 times a night and had difficulty falling asleep. (Tr. 458-61). On mental status examination, plaintiff was oriented but had poor judgment and insight. Plaintiff was prescribed Ambien and Restoril for insomnia. A sleep study in October 2013 disclosed a 69% sleep efficiency, with a 56-minute delay in sleep onset, 12 awakenings, and 112 arousals. Plaintiff's sleep pattern was not due to significant obstructive sleep apnea. (Tr. 597-98). It was recommended that plaintiff lose weight to reduce snoring and receive treatment for his restless legs syndrome and insomnia.

On February 25, 2014, plaintiff met with Daniela Kantcheva, APRN, at CCC. (Tr. 487). He reported that he had been off his medication since 2012. He stated that he wanted psychological testing and supportive therapy before resuming medication. On mental status

examination, plaintiff had appropriate affect and mood, logical thought processes, and fair insight and judgment. He was alert and oriented and denied experiencing suicidal ideation, homicidal ideation, or hallucinations.[10] Ms. Kantcheva diagnosed plaintiff with major depression, recurrent, in partial remission, and referred him to New Vision Counseling for testing and supportive counseling.

Georgette Johnson, Psy.D., of New Vision Counseling, completed a psychological evaluation on March 26, 2014. (Tr. 501-09). Plaintiff reported that he had never married or had any long-term intimate relationships. He had a small group of friends with whom he socialized. He had a history of conflict with others, especially in work settings. His present conflict with the next-door neighbor caused him considerable anguish, including hostile thoughts, hypervigilance, and paranoid ideation. He had recently reenrolled in outpatient services at CCC and would receive targeted case management services. Plaintiff's history of mood and emotional disturbance began when he was 13, with a period of severe depression and suicidal thinking in 1994. At present, he was severely depressed, with frequent episodes of crying, feelings of hopelessness, low self-esteem, irritability, suicidal ideation, homicidal thoughts, and agitation with explosive anger. He also had severe anxiety with panic attacks. He cried profusely during the evaluation at the thought of losing his pet. Dr. Johnson noted that plaintiff "was not

---

[10] Ms. Kantcheva's assessment of plaintiff's mental status did not vary across 19 visits (Tr. 487, 485, 484, 570, 568, 567, 566, 565, 564, 552, 549, 596, 595, 594, 593, 592), although on two occasions in July 2014 she did add a note that there was no overt psychosis. (Tr. 575, 572). Particularly notable is that Ms. Kantcheva's assessment of plaintiff's mental status remained unchanged even for the session in which he swore at her and stormed out. (Tr. 591). There are indications that some of the text in Ms. Kantcheva's progress notes carried over from session to session even where it was no longer applicable. For example, Ms. Kantcheva increased plaintiff's trazodone dosage in June 2015, (Tr. 564) but incorrectly stated in February, April, and September 2015 that she was making changes to the dosage of trazodone. (Tr. 567, 566, 565, 552). In October 2016, Ms. Kantcheva ordered an increase in plaintiff's Requip. (Tr. 595). The same language appeared in the notes in February 2017, even though dose remained unchanged. (Tr. 594). Also in October 2016, Ms. Kantcheva stated that he tolerated his medications well — as she did in every note — despite plaintiff's report that trazodone made him sick.

reassuring about his risk of self-harm" in the future and that he experienced homicidal and suicidal thoughts on a recurring basis. (Tr. 508). On mental status examination, plaintiff was alert and oriented, with fair eye contact and blunted affect, and depressed and anxious mood. He appeared agitated, distraught, and considerably uptight. He was not overtly psychotic but had paranoid thinking and persecutory beliefs, some of which might have been reality-based. He had mild to moderate impairments in both recent and remote memory. His cognitive functioning was in the average to high-average range with adequate abstract reasoning potential. He was responsive, cooperative, and generally friendly. His judgment was fair. Plaintiff was presently taking Restoril, Lipitor, and Klonopin.[11] He was not taking prescribed Synthroid or Meloxicam.

Plaintiff underwent four hours of psychological testing with Dr. Johnson, who administered the Personality Assessment Inventory (PAI), the Minnesota Multiphasic Personality Inventory (MMPI-2d ed.), and Adult Sentence Completion. (Tr. 510-13). In a report dated April 27, 2014, Dr. Johnson noted that plaintiff's scores on the PAI indicated clinically significant and severe ranges of anxiety, depression, and suicidal ideation, with significant symptoms of reality impairment and a possible thought disorder, paranoid interactions, and characteristics that reflected a borderline personality disorder. Plaintiff's scores on the MMPI suggested that he was hostile, distrustful, irritable, self-centered, highly sensitive to criticism from others, and likely to infer that others were hostile and had negative intentions.[12] Dr. Johnson diagnosed plaintiff with: (1) major depressive disorder, recurrent, severe with psychotic features; rule out bipolar disorder, schizoaffective disorder, schizophrenia, and delusional disorder; (2) generalized anxiety disorder

_____

[11] There is no indication in the present record when plaintiff was first prescribed Klonopin.
[12] Plaintiff had a moderately severe elevation on the MMPI's F-scale, one of the MMPI's validity scales. According to Dr. Johnson, plaintiff's score might indicate a plea for help or desperateness on plaintiff's part. Importantly for the analysis here, she stated that the score was not so elevated as to invalidate the test results. (Tr. 511).

with features of panic disorder; rule out panic disorder and intermittent explosive disorder; and (3) paranoid personality disorder. She recommended that plaintiff attend his appointments at CCC, take his medications as prescribed, get a case manager or community support worker, and meet regularly with his primary care medical provider.

Plaintiff failed to keep appointments at CCC on March 31, 2014, and April 4, 2014. (Tr. 486). On April 8, 2014, Ms. Kantcheva noted that plaintiff was awaiting a court date on charges of unlawful use of a weapon and destruction of property.[13] (Tr. 485). He complained of anxiety, depression, and feeling stressed by financial and legal problems. He continued to drink 12 to 16 beers two or three times a week. Ms. Kantcheva diagnosed plaintiff with major depression, recurrent, and alcohol dependence. She prescribed Zoloft for depression and Vistaril for anxiety. On May 7, 2014, plaintiff reported to Ms. Kantcheva that the Zoloft was not working and he felt very depressed. His father died two weeks earlier and he had a lot of conflict with his two sisters about finances and selling the family home. Ms. Kantcheva discontinued Zoloft, started Paxil, and continued Vistaril for anxiety. She also referred him to CCC's Community Psychiatric Rehabilitation Center (CPRC). On June 11, 2014, plaintiff reported that he had discontinued Paxil because it did not work. (Tr. 575). He was continuing to take Klonopin and Restoril prescribed by Dr. Kasten, his primary care physician. Ms. Kantcheva discontinued the prescription for Paxil. On July 9, 2014, plaintiff called CCC seeking an increase in his Vistaril. (Tr. 574). He reported that he could not sleep despite taking Ambien, Restoril, Klonopin, and Vistaril and thought he might "flip out." Ms. Kantcheva saw plaintiff on July 22, 2014, accompanied by his case worker. (Tr. 572). Plaintiff felt depressed and was continuing to drink beer. He was taking Klonopin, Ambien, and Restoril prescribed by Dr. Kasten. He did not want

---

[13] Plaintiff fired a pellet gun at the neighbor's house. (Tr. 640).

antidepressants.  Ms. Kantcheva continued plaintiff's prescription for Vistaril.  On July 31, 2014, plaintiff told Ms. Kantcheva that Vistaril was not working.  She instructed him to ask Dr. Kasten to increase the dosage of his Klonopin.  (Tr. 571).  On August 11, 2014, Ms. Kantcheva noted that plaintiff was sleeping 7 to 8 hours a night.  (Tr. 570).  He complained of anxiety and she increased the dosage of his Vistaril.  In November and December 2014, Ms. Kantcheva noted that plaintiff's case worker was helping him find housing.  (Tr. 568, 567).  He had been taking Ambien and Restoril as prescribed by Dr. Kasten, but he could no longer afford to see him.  Ms. Kantcheva prescribed trazodone in addition to Vistaril.

Plaintiff reported improved sleep in February and April 2015.  (Tr. 566, 565).  In June 2015, however, he was not sleeping well and Ms. Kantcheva increased the dosage of his trazodone.  (Tr. 564).  He continued to complain of poor sleep in July 2015.  (Tr. 557-60 — noting that he needed a larger dose of Vistaril but it worsened his restless leg symptoms).

CCC completed an annual evaluation in July 2015.  (Tr. 553-56).  It was noted that plaintiff's art was on display in CCC's gallery and that he attended meetings of the art guild and went to the library regularly.  He continued to experience homicidal hate and rage and had not found a way to cope with these feelings.  His hygiene was poor and he did not wear clean clothes or do laundry because he was trying to save money.  On mental status examination, plaintiff had fair hygiene and grooming, flat affect, and body tics.  He also had a vocal tic.  He was cooperative, and had normal speech, memory, orientation, and thought processes.  His thought content included persecution and homicidal ideation.  He was diagnosed with major depressive disorder, recurrent, moderate.  His Global Assessment of Functioning (GAF) score was 40. [14]

---

[14] A GAF of 31-40 corresponds with "some impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or

In late 2015 and early 2016, plaintiff continued to take Vistaril and trazodone.  (Tr. 552, 549).  He discontinued his treating relationship with Dr. Kasten, his primary care physician, after being kept waiting for more than two hours for a scheduled appointment.  (Tr. 549).  In May 2016, Ms. Kantcheva prescribed Requip,[15] in addition to Vistaril and trazodone, after plaintiff reported he could not sleep more than four or five hours a night due to his restless legs syndrome.  (Tr. 596).  In October 2016, plaintiff's sleep had not improved and he had racing thoughts and was agitated.  (Tr. 595).  Ms. Katcheva increased the dosage of Requip and started him on Rexulti,[16] in addition to Vistaril and trazodone.  In February 2017, plaintiff reported that he never took the Rexulti, "because it's an antipsychotic and I'm not psychotic."  (Tr. 594).  In April 2017, plaintiff stated that he had stopped taking trazodone two months earlier because it "makes me sick and doesn't help me sleep."  (Tr. 593).  He stated that he was sleeping three to four hours a night and demanded Ambien and Klonopin for sleep.  In July 2017, he reported that he was lucky if he slept two hours per night, due to his restless legs syndrome.  (Tr. 592).  In October 2017, plaintiff was very rude and agitated and used profanities against Ms. Kantcheva, before walking out in the middle of the session.  (Tr. 591).  This was his last documented visit with Ms. Kantcheva.

In November 2017, Dr. Johnson completed a second psychological evaluation of plaintiff for the purpose of "diagnostic clarity and treatment planning."  (Tr. 639-54).  Plaintiff reported

mood."  American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

[15] Requip, or ropinirole, is a dopamine agonist that can be used to treat restless legs syndrome.  See https://medlineplus.gov/druginfo/meds/a698013.html (last visited Aug. 15, 2019).

[16] Rexulti, or brexpiprazole, is an atypical antipsychotic that is also used with an antidepressant to treat depression when symptoms cannot be controlled by the antidepressant alone.  See https://medlineplus.gov/druginfo/meds/a615046.html (last visited Aug. 15, 2019).

that his condition had worsened since 2014 and he was in a constant state of hate and rage, with persistent daily agitation and exacerbated insomnia. Dr. Johnson noted that plaintiff became agitated when talking about his current living situation, speaking loudly and using expletives. She described him as easily aroused and ready to attack in response to encroachment by others. Plaintiff experienced several symptoms and behavioral reactions characteristic of PTSD, including anger, homicidal rage, hypervigilance, hyperstartle response, recurring thoughts, flashbacks and angry memories, erratic and unstable moods, depressive mood states, and avoidance reactions. He had near-daily feelings of worry, dread, a sense of impending doom, panic, and obsessions about whether his neighbors would vandalize his property or intentionally provoke him. His prolonged insomnia complicated his ability to manage his symptoms. His scores on the Personality Assessment Inventory again reflected severe and debilitating ranges of depression, proneness to substance abuse or dependence, and personality disordered symptoms, with affective instability and aggressive behavioral tendencies. His scores were typical of people with borderline and antisocial personality disorders. He did not cope well with routine stressors of daily life and he reacted to highly stressful events with intensive anger, hostility, and intimidation. His emotional reactions were extreme, with anger turning to rage, and he had an agitated and irritable presence. Dr. Johnson diagnosed plaintiff with PTSD; major depressive disorder, recurring, severe with psychotic features; insomnia disorder with features of sleep-wake cycle disorder; unspecified personality disorder with borderline, antisocial and paranoid features; and history of polysubstance dependence in full remission. The ALJ compared Dr. Johnson's report with that of Dr. Khot, discussed immediately below, and concluded that major depression was the only diagnosis supported by the record. (Tr. 24).

Dr. Khot evaluated plaintiff on March 6, 2018. (Tr. 665-67). Dr. Khot noted that plaintiff had a long history of depression, anxiety, and insomnia. He had crying spells, reduced energy, reduced motivation, and suicidal thoughts. He had previously taken Zoloft, which helped his symptoms but caused headaches, while other medications in the class of selective serotonin reuptake inhibitors (SSRIs) had little efficacy. Plaintiff's sleep issues had worsened since he stopped taking Requip for his restless legs syndrome. In addition, he had anxiety and panic attacks related to where he lived. He lost his temper and was easily provoked. He was not presently suicidal or homicidal. On mental status examination, plaintiff made fair eye contact and did not have psychomotor agitation or abnormal movements. His speech was normal in rate and rhythm. His concentration and attention were fair and he had logical, well-organized thought processes, He did not have hallucinations or paranoid delusions. His mood and affect were anxious. Dr. Khot diagnosed plaintiff with major depressive disorder, rule out major depressive disorder with psychotic features.[17] He assigned a GAF score of 50.[18] Dr. Khot prescribed doxepin and restarted his prescription for Requip. Plaintiff was to continue in the CPRC and enter into counseling with Dr. Johnson.

### C. Opinion evidence

On June 23, 2014, State agency consultant Joan Singer, Ph.D., completed a Psychiatric Review Technique form based on a review of the record. (Tr. 117-20, 131-34). Dr. Singer concluded that plaintiff had medically determinable impairments in the categories of 12.04

---

[17] In the Medical Source Statement completed six days later on March 12, 2018, Dr. Khot included a diagnosis of generalized anxiety disorder in addition to major depressive disorder. (Tr. 661-62).

[18] A GAF of 41-50 corresponds with "serious symptoms (e.g.. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

(affective disorders), 12.06 (anxiety-related disorders), and 12.08 (personality disorders). Dr. Singer noted that plaintiff had a long history of noncompliance with medication and alcohol dependence and opined that his functioning might improve if he were to sustain treatment compliance and refrain from drug and alcohol use. Dr. Singer noted that plaintiff was able to go out on his own, shop when needed, manage money, and did not need reminders for his medications, self-care, or chores. She found that plaintiff had mild restrictions in the activities of daily living, and moderate difficulties in maintaining social functioning and maintaining concentration, persistence, and pace. He had no episodes of decompensation. In a mental residual functional capacity assessment (Tr. 121-23, 135-37), Dr. Singer opined that that plaintiff had no understanding and memory limitations. He was moderately limited in the ability to carry out detailed instructions. He was also moderately limited in some components of attention, concentration, persistence, and pace; similarly, he was moderately limited in some components of interacting with others in a work setting and adapting to changes. Finally, he was moderately limited in his abilities to work in proximity to others and to complete a normal work schedule. Dr. Singer found that plaintiff was capable of performing at least simple repetitive tasks away from the public. The ALJ gave some weight to Dr. Singer's opinion. (Tr. 27).

On July 21, 2014, Matthew Karshner, M.D., completed a consultative examination. (Tr. 517-22). After evaluating plaintiff's musculoskeletal complaints, Dr. Karshner concluded that plaintiff could perform work-related activities at the sedentary to light exertional level. The ALJ rejected this opinion as unsupported by the totality of the evidence of record. (Tr. 25). In particular, the ALJ noted that plaintiff received minimal treatment for his arthritis and that imaging showed only mild degenerative changes. Plaintiff does not contest the ALJ's determination of his physical RFC.

16

The record contains three opinions authored by Dr. Johnson. In September 2014, Dr. Johnson completed a 3-page "Medical Statement Concerning Depression with Anxiety, OCD, PTSD or Panic Disorder for Social Security Disability Claim." (Tr. 524-26). Dr. Johnson endorsed 13 of 18 listed symptoms: anhedonia; sleep disturbance; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; thoughts of suicide; hallucinations, delusions, or paranoid thinking; generalized persistent anxiety; vigilance and scanning; persistent irrational fear of a specific object, activity or situation that results in a compelling desire to avoid the object, activity, or situation; recurrent severe panic attacks occurring at least once a week; and recurrent obsessions or compulsions that are a source of marked distress. She found that plaintiff had marked limitations in the activities of daily living and in maintaining social functioning. He also had deficiencies of concentration, persistent or pace and repeated episodes of deterioration in work settings. So long as he took medication, he was not completely unable to function outside of the home due to panic attacks. With respect to work limitations due to plaintiff's psychiatric condition, Dr. Johnson found that plaintiff was moderately impaired in the abilities to maintain attention and concentration for extended periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers without distracting them or exhibiting behavioral extremes. He was markedly impaired in the abilities to understand and remember detailed instructions; perform activities within a schedule and maintain attendance and punctuality; sustain an ordinary routine without special supervision; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and maintain a normal work schedule and work consistently without an unreasonable breaks. Indeed, Dr. Johnson noted, plaintiff had lost a number of jobs due to his inability to maintain a normal work

schedule. Dr. Johnson observed that plaintiff had chronic psychological symptoms and complaints for which he had been fired from multiple jobs and which interfered with daily functioning. As discussed below, the ALJ gave Dr. Johnson's opinion partial limited weight. (Tr. 25-26).

In November 2017, in conjunction with her second psychological assessment of plaintiff, Dr. Johnson opined that plaintiff's capacity for full-time or partial employment in the upcoming 12 to 24 months was severely restricted, due to: (1) chronic and debilitating sleep disturbance; (2) the current nature and volatility of mood states and post-traumatic reactions; and (3) his severely diminished capacity to establish or maintain appropriate professional relations with coworkers, supervisors, and the public. (Tr. 653-54). The ALJ did not address this component of Dr. Johnson's 2017 evaluation.

In February 2018, Dr. Johnson completed a "Medical Source Statement — Mental." (Tr. 657-58). She listed his diagnoses as PTSD; major depressive disorder, recurrent, with psychotic features; sleep disorder; and borderline personality disorder with antisocial features, rule out intermittent explosive disorder. As a general matter, Dr. Johnson's assessment of plaintiff's abilities to perform work-related activities had worsened since her 2014 statement. She additionally noted that plaintiff had to carry a notebook to aid his memory and had a low frustration tolerance. In addition, he had an intimidating presence and a low threshold for what she termed "provocative management." His ability to plan was impeded by his sense of impending doom. Furthermore, his neighbors had commented on his hygiene and odor. He was likely to be off task and to miss four or more days a month due to his conditions. The ALJ gave this opinion limited weight. (Tr. 26).

18

On March 12, 2018, Dr. Khot completed a "Medical Source Statement — Mental." (Tr. 661-62). Dr. Khot listed plaintiff's diagnoses as major depression and generalized anxiety disorder. He noted that plaintiff's conditions affected all aspects of his functioning, and rated plaintiff as markedly or extremely limited in each category of work-related activities, with the exception of asking simple questions or seeking assistance; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; and taking precautions against normal hazards, all of which Dr. Khot rated as moderately impaired. Again, the ALJ gave this opinion limited weight.

### III. Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that he is disabled under the Act. See Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). Steps one through three require the claimant to prove (1) he is not currently engaged

in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process). If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Pate-Fires, 564 F.3d at 942. "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole. Pate-Fires, 564 F.3d at 942. Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV.  The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above. The ALJ found that plaintiff met the insured status requirements through June 30, 2015, and had not engaged in substantial gainful activity since March 26, 2014, the amended alleged onset date. (Tr. 1). At steps two and three, the ALJ found that plaintiff had severe impairments of major depression and a history of alcohol abuse. Plaintiff had nonsevere impairments of degenerative

joint disease of the knees, obesity, hypertension, hyperlipidemia, and hypothyroidism, deformity of the feet, and kidney stones. (Tr. 18-19). Plaintiff does not challenge the ALJ's determination of his severe impairments. The ALJ then determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment.[19] (Tr. 20-21).

The ALJ next determined that plaintiff had the RFC to perform a full range of work at all exertional levels, but was limited to performing simple, routine tasks, in an environment free of fast-paced quota requirements and requiring only simple work decisions with few, if any, workplace changes. Plaintiff could have occasional interaction with coworkers and no interaction with the general public. (Tr. 21). In assessing plaintiff's RFC, the ALJ summarized the medical record and opinion evidence, as well as plaintiff's statements regarding his abilities, conditions, and activities of daily living. While the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the ALJ also determined that plaintiff's statements regarding their intensity, persistence and limiting effect were "not entirely consistent" with the medical and other evidence. (Tr. 22). The ALJ stated that plaintiff's statements about his limitations were "less than persuasive and only partially consistent with treatment notes. The overall medical evidence of record is limited at best and fails to support greater limitation than accommodated in the residual functional capacity." (Tr. 22).

At step four, the ALJ concluded that plaintiff was unable to perform his past relevant work as a "powerhouse mechanic apprentice." (Tr. 27). He was in the "closely approaching advanced age" category on the alleged onset date and in the advanced age category at the time of

---

[19] For the purposes of considering the paragraph B criteria for mental impairments, the ALJ found that plaintiff had mild limitations in understanding, remembering, or applying information; and in the ability to adapt or manage himself. He had moderate limitations in his abilities to interact with others; and to concentrate, persist, and maintain pace. (Tr. 20-21). He did not satisfy the paragraph C criteria.

the decision. (Tr. 28). He had at least a high school education and was able to communicate in English. Id. The transferability of job skills was not material because using the Medical-Vocational Rules as a framework supported a finding that plaintiff was not disabled regardless of whether he had transferable skills. Id. The ALJ found at step five that someone with plaintiff's age, education, work experience, and functional limitations could perform other work that existed in substantial numbers in the national economy, namely as a laundry worker, machine feeder and hand packager. Id. Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act from March 26, 2014, the amended alleged onset date, through May 9, 2018, the date of the decision. (Tr. 29).

## V. Discussion

Plaintiff argues that the ALJ improperly discounted the opinions of examining psychologist Dr. Johnson and treating psychiatrist Dr. Khot. As a consequence, he argues, the mental RFC the ALJ developed does not adequately reflect plaintiff's limitations.

When evaluating opinion evidence, an ALJ is required to explain in the decision the weight given to any opinions from treating sources, non-treating sources, and non-examining sources. See 20 C.F.R. § 404.1527(e)(2)(ii). The regulations require that more weight be given to the opinions of treating physicians than other sources.[20] 20 C.F.R. § 404.1527(c)(2). Similarly, more weight is given to examining sources than to nonexamining sources. 20 C.F.R. § 404.1572(c)(1). "A treating physician's opinion should be granted controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

[20]This continues to be true for plaintiff's claim because it was filed before March 27, 2017. Combs v. Berryhill, 868 F.3d 704, 709 (8th Cir. 2017); 20 C.F.R. § 404.1527 ("For claims filed . . . before March 27, 2017, the rules in this section apply."); § 404.1527(c)(1) ("Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you.").

inconsistent with the other substantial evidence in the record." Nowling v. Colvin, 813 F.3d 1110, 1122 (8th Cir. 2016) (internal quotation and citations omitted). A treating physician's opinion, however, "does not automatically control or obviate the need to evaluate the record as a whole." Id. at 1122-23 (citation omitted). Rather, "an ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Id. (citation omitted).

The ALJ addressed Dr. Johnson's September 2014 opinion in his first decision on plaintiff's application in May 2016. (Tr. 157). At that time, the ALJ gave

> significant weight to the opinions of the examining psychologist, Dr. Johnson, who indicated that plaintiff's mental impairments impose mild limitations in performing simple work-related tasks and to responding appropriately to changes in the work setting, while he is moderately impaired in his ability to interact with others in the work environment. The opinions of Dr. Johnson are supported by claimant's history of mental health treatment for depression and anxiety that are, for the most part, stable with mental health treatment compliance, which supports Dr. Johnson's conclusion that the claimant is capable of performing simple work-related activities. As well, the record supports Dr. Johnson's conclusion that the claimant is moderately impaired in his ability to interact appropriately with others in a work setting, based upon claimant's history of interpersonal conflicts, especially in the work place. As well, mental health records from Community Counseling Center document[] claimant's symptoms of anger control issues secondary to conflicts with his neighbor, while he reported having friends and no problems getting along with others in general.

On review of this decision, the Appeals Council noted that, despite giving Dr. Johnson's opinion significant weight, the ALJ did not adopt that portion of her opinion in which she found that plaintiff had marked limitations in the abilities to maintain attendance, complete a normal work schedule, and perform at a consistent pace. The Appeals Council directed the ALJ to explain why these more restrictive limitations were not adopted. (Tr. 166-67).

On his second review of Dr. Johnson's 2014 opinion, the ALJ gave it "partial limited weight," again adopting those portions finding that plaintiff had mild and moderate limitations. The ALJ gave no weight to Dr. Johnson's opinion that plaintiff had marked limitations, however, reasoning that she made "this remote September 2014 statement early on in plaintiff's treatment, and since that time his symptoms have stabilized. Finally, Dr. Johnson made this finding after a one-time visit." (Tr. 26).

The record as a whole does not support the ALJ's assertion that plaintiff's symptoms stabilized after September 2014. For example, plaintiff reported poor sleep throughout the period under review. After Ms. Kantcheva prescribed trazodone in December 2014, plaintiff reported improved sleep in February and April 2015, but it had deteriorated again in June 2015, necessitating an increase in the trazadone dosage. (Tr. 567, 566, 564). His sleep remained poor through July 2017, when he reported that he was lucky to sleep two hours a night. (Tr. 557-58, 549, 596, 595, 594, 593, 592). Plaintiff's reports of poor sleep are consistent with the 2013 sleep study during which plaintiff had 12 awakenings and 112 arousals with a sleep efficiency of 69.2%.[21] (Tr. 597). The Court notes that the ALJ characterized the results of this sleep study as essentially normal. (Tr. 25). While the ALJ is correct that the study did not show that plaintiff suffered from significant obstructive apnea, it did show that plaintiff experienced "moderately fragmented sleep." And, as Dr. Johnson noted in her November 2017 assessment, plaintiff's poor sleep impaired his ability to manage his symptoms and emotional reactions and degraded his abilities to concentrate and complete tasks. (Tr. 644-645). Another indication that plaintiff's symptoms did not stabilize is the number of medication changes made by plaintiff's treatment

---

[21] Sleep efficiency lower than 85% is considered poor. https://www.verywellhealth.com/sleep-efficiency-3014912 (last visited Aug. 16, 2019).

providers to address his depression and anxiety. (Tr. 498, 495, 496, 460, 485, 484, 575, 570, 567, 564, 595, 594, 593, 665).

The ALJ also gave limited weight to Dr. Johnson's February 2018 opinion. The ALJ stated that Dr. Johnson gave her opinion "following a consultative examination performed on the same day[22] wherein the claimant reported significant unsubstantiated symptoms inconsistent with treatment notes that document the denial of symptoms, some noncompliance with medication and treatment albeit essentially normal mental status examinations, and an expressed desire to 'get disability' with enrollment in the CPRC program." (Tr. 26). To the extent that the ALJ relied on Ms. Kantcheva's mental status examinations to discount Dr. Johnson's opinion, the Court has noted above the numerous inaccuracies that render those examinations of dubious value.[23] More significantly, the ALJ's summation neglects the fact that Dr. Johnson's consultative evaluation, which lasted four hours, included administration of the Personality Assessment Inventory. Plaintiff's scores on this test showed "severe and debilitating ranges of depression, substance abuse/dependence proneness (based on previous history), and personality disordered symptoms." (Tr. 650). His most "prominent elevations" occurred on measures of depression and suicide, but he also had elevated scores on scales showing "severe personality

_____

[22] The consultative evaluation was actually completed in November 2017. (Tr. 638). It is not apparent that the timing of the opinion in relationship to the evaluation has much significance in determining what weight it should receive.

[23] In addition, Ms. Kantcheva always described plaintiff's mood and affect as "appropriate." What she meant by this term is ambiguous. "*Affect* is the patient's expression of emotion; *mood* refers to the more sustained emotional makeup of the patient's personality. Patients display a range of affect that may be described as broad, restricted, labile, or flat. Affect is <u>inappropriate</u> when there is no consonance between what the patient is experiencing or describing and the emotion he is showing at the same time (e.g., laughing when relating the recent death of a loved one). David C. Martin, The Mental Status Exam in <u>Clinical Methods: The History, Physical, and Laboratory Examinations</u> Ch. 207 (H.K. Walker, et al. eds. 3rd ed. 1990), found at <u>https://www.ncbi.nlm.nih.gov/books/NBK320/</u> (last visited Aug. 16, 2019) (underlining added). Thus, "appropriate" mood and affect might mean a patient's affect was congruent with the underlying mood, whether the mood was depressed or euthymic. Alternatively, Ms. Kantcheva may have meant to convey that plaintiff's mood and affect were "normal," or unremarkable.

26

dysfunction causing friction, conflict, and disturbances in personal relationships," further aggravated by results showing aggressive behavioral tendencies. (Tr. 650-51). His scores were typical of borderline personality and antisocial personality disorders. While his scores for anxiety were in the mild to moderate range, plaintiff had elevated scores on a scale indicating an "unusually high amount of life stress." (Tr. 651). Plaintiff's results on the PAI, which no one has suggested were invalid, support Dr. Johnson's opinions regarding his mental limitations. The Court finds that the ALJ decision to discount Dr. Johnson's opinions is not supported by substantial evidence in the record.

The ALJ gave Dr. Khot's March 2018 opinion limited weight. The ALJ found that the marked and extreme limitations Dr. Khot endorsed were not supported by plaintiff's conservative treatment and lack of hospitalizations. (Tr. 26). Although plaintiff did not require hospitalization, he received CPRC services and required multiple medication changes, evidence that his mental impairments were not stable. The ALJ also stated that Dr. Khot had only seen plaintiff one time before completing this form. The record reflects, however, that Dr. Khot treated plaintiff in 2011 and 2012, and was aware of plaintiff's treatment history with Ms. Kantcheva. The ALJ also relied on the fact that Dr. Khot listed plaintiff's diagnoses as major depression and generalized anxiety disorder in his opinion, even though a week earlier he had diagnosed plaintiff with major depression alone. There is no dispute, however, that plaintiff experienced significant anxiety symptoms throughout the period under consideration, regardless of whether a formal diagnosis of such was warranted. For example, in the earlier session, plaintiff presented with anxious mood and affect and a "long history of depression and anxiety and insomnia." (Tr. 665-666). And, Dr. Khot diagnosed plaintiff with generalized anxiety disorder as early as 2012. Furthermore, Dr. Smith, the State agency consultant found that

plaintiff had a medically determinable impairment of anxiety-related disorder. (Tr. 118, 132). In addition, he was consistently prescribed medication to address symptoms of anxiety. (Tr. 496, 488, 485, 484, 572, 570, 568, 549). Finally, the ALJ found that Dr. Khot's opinion was inconsistent with plaintiff's "admitted activities and abilities." (Tr. 26). Plaintiff's ability to perform routine household chores, prepare sandwiches, care for his dog, and engage in some hobbies is not inconsistent with Dr. Khot's assessment regarding plaintiff's capacity to perform work related activities under the stress of sustained work. See Hutsell v. Massanari, 259 F.3d 707, 713 (8th Cir. 2001) (noting that plaintiff's activities do not "equate with a finding that a claimant can work on a daily basis in the sometimes competitive and stressful environment of the working world") (internal quotations and citations omitted); see also Hill v. Berryhill, No. 18-CV-15-MAR, 2019 WL 699897, at *9 (N.D. Iowa Feb. 20, 2019) ("The Eighth Circuit has repeatedly held that a claimant's ability to perform household chores in a safe and structured home environment does not necessarily mean she can perform gainful work activity outside the home.") (citing cases). The Court finds that the ALJ's decision to discount Dr. Khot's opinion was not supported by substantial evidence in the record.

* * * * *

For the foregoing reasons, the Court finds that the ALJ's determination is not supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate Judgment shall accompany this Memorandum and Order.


/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 5th day of November, 2019.